IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      v.                       )        Criminal Action No.
                               )        16-00110-01-CR-W-DGK
JAMES E. EVERETT, JR.,         )
                               )
            Defendant.         )

## REPORT AND RECOMMENDATION TO  GRANT IN PART AND DENY IN PART DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Before the court is defendant's motion to suppress his statement[1] that he had a gun in his car, on the ground that he was in custody and was questioned in violation of the Fifth Amendment and <u>Miranda v. Arizona</u>,  384 U.S. 436 (1966).  In a supplemental motion, defendant moved to suppress the gun found in the car and the heroin found on defendant's person.  I find that (1) the government has not satisfied its burden of proving by a preponderance of the evidence that defendant's statement was not obtained in violation of <u>Miranda</u>, (2) defendant's statement was not coerced and therefore the <u>Miranda</u> violation does not require suppression of the firearm, (3) the seizure of the firearm from the car was done pursuant to a lawful inventory search, and (4) the seizure of the heroin was unlawful as the search of defendant's person exceeded to scope of a pat down for weapons.  Therefore, defendant's motion to suppress his statement and the heroin should be granted; his motion to suppress the firearm should be denied.

_____

      [1]Defense counsel stated during the first hearing that the only remedy sought is suppression of the statement, not suppression of the heroin (Tr. at 14).  However, he subsequently filed a supplemental motion seeking suppression of the heroin.

## I. BACKGROUND

On March 10, 2016, defendant went to the federal building in Kansas City, Missouri, and became unruly and threatening. Officers struggled to handcuff defendant. Once he was on the ground and in handcuffs, defendant said that he had a gun in his car. His person was searched and police recovered a small amount of heroin from his pants pocket. The car, which was illegally parked, was towed; and during an inventory search a firearm was found.

A criminal complaint was filed on March 11, 2016, charging defendant with possessing a firearm after having been convicted of a felony. On March 30, 2016, an indictment was returned adding one misdemeanor count of possessing a controlled substance. On November 15, 2016, a superseding indictment was returned, adding one count of threatening a federal law enforcement officer.

On December 1, 2016, defendant filed a motion to suppress challenging his statement on the ground that he was questioned while in custody and without having been advised of his Miranda rights (document number 35). The government filed a response on December 23, 2016 (document number 38) arguing that the public safety exception to Miranda applies, and that defendant's statement was voluntary and non-responsive. On December 30, 2016, defendant filed a reply (document number 39) disputing the government's summary of the facts and disputing the government's argument that the public safety exception applies in this case.

On January 4, 2017, I held a suppression hearing. The United States was represented by Assistant United States Attorneys Jeffrey McCarther and Bradley

Kavanaugh. Defendant was present, represented by Assistant Federal Public Defender

Marc Ermine. The following witnesses testified:

1.    FPS Inspector David Yadon

2.    Detective Bradley Bailey, Kansas City, Missouri Police Department

The following exhibits were admitted into evidence:

D. Ex. 1    Report of Investigation by Special Agent Travis Vas, Federal
            Protective Service

D. Ex. 2    Supplemental Report by FPS Officer Patterson

D. Ex. 3    Affidavit in support of criminal complaint signed by Agent Vas

A transcript of the hearing was filed on January 9, 2017 (document number 44).

On January 11, 2017, defendant filed a supplemental motion to suppress

(document number 46). Defendant argues that the evidence presented during the first

hearing establishes that not only his <u>Miranda</u> rights were violated, but his Fifth

Amendment rights were violated as well since his statement about the gun was

involuntary and was the result of coercive police action.[2] "As such, derivative evidence

-- the gun found in the car Mr. Everett was driving -- is subject to suppression."

Defendant also argues that Officer Yadon testified that defendant was merely detained

and not under arrest; however, officers searched his person (finding heroin) and this

---

[2]"Six officers took Mr. Everett to the ground, grabbed his arms, prevented him
from lifting his head, and handcuffed him. One officer was prepared to use his Tazer on
Mr. Everett. Mr. Everett obviously was impaired by narcotics or a mental disorder
according to the officers, and he was making incoherent statements. The environment
was coercive and Mr. Everett was in no shape to exercise self-determination. Whether
Mr. Everett was asked, 'did you drive here,' or was asked, 'do you have a weapon,' his
answer was compelled by coercive tactics." Def. supplemental motion, p. 3, ¶ 5.

3

search exceeded the bounds of a frisk for weapons and therefore the heroin should be suppressed.

A supplemental hearing was held on February 8, 2017. The United States was represented by Assistant United States Attorneys Jeffrey McCarther and Courtney Pratten. Defendant was present, represented by Assistant Federal Public Defender Marc Ermine. The following witnesses testified:

1.      Special Agent Travis Vas, Federal Protective Service

2.      Detective Bradley Bailey, Kansas City, Missouri, Police Department

The following exhibits were admitted into evidence:

P. Ex. 6        Kansas City, Missouri, Police Department Procedural Instruction for Towing and Protective Custody of Vehicles and Contents

P. Ex. 7        Tow report

P. Ex. 8        Kansas City, Missouri, Police Department Incident Report prepared by Detective Bailey

P. Ex. 9        Kansas City, Missouri, Police Department Uniform Parking Citation

D. Ex. 4        Supplemental report written by Inspector David Wright

D. Ex. 5        Supplemental Report written by Officer Wesley Patterson

A transcript of the second hearing was filed on February 15, 2017 (document number 59).

## II.      FINDINGS OF FACT

On the basis of the evidence presented at the suppression hearings, I submit the following summaries of the versions of the incident.

4

**FPO Inspector David Yadon**

On March 10, 2016, FPO Inspector David Yadon was working at 601 East 12th Street in Kansas City, the Richard Bolling Federal Building (1Tr. at 7-8). He was carrying a communications radio for dispatch in the event of incidents requiring law enforcement response (1Tr. at 8).

At approximately 8:30 a.m., Inspector Yadon was told via his radio that the protective security officers ("PSOs") stationed in the lobby had a disorderly person and needed assistance (1Tr. at 8, 26). Inspector Yadon was on the second floor of the Federal Building and headed to the lobby on the first floor (1Tr. at 8, 14-15).

When he arrived in the lobby, Inspector Yadon was told by the PSOs that a person had come into the facility and asked for a federal judge (1Tr. at 9). The man had been told there were no federal judges in the building and he would have to leave (1Tr. at 9). The man had reportedly been slapping himself in the face, and he was making incoherent statements about his son (1Tr. at 26-27). The PSOs told Inspector Yadon that the man was out on the street (1Tr. at 9).

Inspector Yadon and two other inspectors (Wright and Patterson) started walking out toward the street and saw defendant in the street, screaming, waving his arms, and pacing back and forth (1Tr. at 9-10, 15, 27). Inspector Yadon asked defendant what was going on and started walking toward defendant (1Tr. at 10). Defendant began walking toward the inspectors, yelling obscenities (1Tr. at 10, 15-16). At some point defendant turned around and started walking away (1Tr. at 16). For unknown reasons, defendant turned around and headed back toward the inspectors, saying things such as, "I'll kick your ass" (1Tr. at 10, 15-16). They asked defendant what the problem was,

5

why he was angry (1Tr. at 10). Inspector Yadon tried to engage defendant, but defendant looked away and said to another inspector, "I'll fucking kill you" (1Tr. at 10).

At this time, Inspector Schwarz was getting out of his vehicle nearby and headed toward the group (1Tr. at 15). Inspector Yadon did not know what defendant's intentions were (1Tr. at 11, 17-18). Defendant was clenching his fists which is a pre-assault indicator as taught by the Policy Academy, and he was screaming and yelling threats (1Tr. at 29). For the safety of everyone present, Inspector Yadon circled around behind defendant and grabbed his arms, hoping to handcuff him behind his back (1Tr. at 11, 17-18). At the same time, Inspector Wright put his hand on his Tazer (1Tr. at 17). When Inspector Yadon grabbed defendant's arms, defendant began kicking, twisting, biting, and trying to get free (1Tr. at 11, 17). It took six individuals to restrain defendant (Inspectors Yadon, Schwarz, Wright and Patterson, and two Kansas City, Missouri, Police detectives) (1Tr. at 11, 18). When he was taken down to the ground, defendant was banging his head on the concrete (1Tr. at 27).

While this was going on, Inspector Yadon noticed keys come out of defendant's hand; and after he was taken to the ground, the keys were lying in front of him (1Tr. at 12). Inspector Yadon asked defendant if he had driven to the Federal Building (1Tr. at 12). The PSOs had indicated that defendant came from a silver car which was parked in a spot reserved for emergency vehicles; it would have been a safety hazard to leave defendant's car parked in that spot (1Tr. at 12-13). Defendant said, "Yes, I drove and I have a gun in the car" (1Tr. at 13).

After defendant was restrained, an ambulance was called (1Tr. at 11-12). Based on his training and experience, Inspector Yadon thought it obvious that defendant was

Case 4:16-cr-00110-BCW   Document 62   Filed 03/03/17   Page 6 of 32

under the influence of some type of drug or was experiencing some mental issue, and Inspector Yadon wanted to make sure medical assistance was available (1Tr. at 12, 26).

While defendant was face-down on the ground with his hands cuffed behind him, his pockets were searched and heroin was recovered (1Tr. at 18-19). Defendant was never placed under arrest for a crime (1Tr. at 33).

Defendant was taken by ambulance to Truman Medical Center where he was monitored for drug usage or mental health problems, and he tested positive for PCP while at Truman (1Tr. at 27). After a gun was found in defendant's car, Inspector Yadon was told to go to Truman to stand by at the hospital while an arrest warrant was being sought (1Tr. at 33-34). At the hospital, defendant was fighting with security staff, he broke free of his restraints, urinated all over his hospital room, and had to be sedated (1Tr. at 33).

During the initial incident, Inspector Yadon did not ask defendant if he had any weapons in his car (1Tr. at 13, 28). He did not ask defendant if he had any weapons on his person (1Tr. at 13, 28). He was not yelling at or hurting defendant when he asked whether defendant had driven to the Federal Building (1Tr. at 13).

**Detective Bradley Bailey**

Detective Bailey testified at both hearings. During the first hearing, Detective Bailey testified as follows: At approximately 8:30 a.m. on March 10, 2016, Detective Bailey and his partner were walking out of the Jackson County Courthouse at the intersection of 12th Street and Locust when they observed defendant wearing all blue and shouting profanities and running around in the street (1Tr. at 35-36). The

7

detectives were about a half a block away (1Tr. at 36). They got in the patrol vehicle and drove toward defendant (1Tr. at 36).

They saw defendant walking aggressively toward the front doors of the Federal Building which is on the south side of 12th Street (1Tr. at 37). As defendant approached the doors of the building, the detectives parked their vehicle directly in front of the building (1Tr. at 37).

As they were getting out of the car, they observed four uniformed security officers make contact with defendant who continued to act in an aggressive and erratic manner, shouting profanity (1Tr. at 37). He appeared not to be following the verbal commands of the officers (although Detective Bailey could not hear what was being said (1Tr. at 42)), and Detective Bailey saw an officer attempt to handcuff defendant behind his back which resulted in a struggle (1Tr. at 37). The detectives approached the group and physically assisted in controlling defendant (1Tr. at 37, 42).

It was difficult to get defendant under control (1Tr. at 37). Officers are trained in various techniques to take control of an individual who is physically resisting, and those techniques failed (1Tr. at 37). Defendant was therefore taken to the ground to get control of him, and he was finally restrained and put in handcuffs (1Tr. at 37-38, 42). Detective Bailey did not observe defendant appear to injure himself during or immediately after the struggle (1Tr. at 38). After he was in handcuffs, defendant continued to resist, continued to shout, began spitting, and he attempted to bang his head on the concrete (1Tr. at 38). Detective Bailey held defendant's head down to prevent him from raising it and continuing to strike it on the ground (1Tr. at 38).

8

Due to defendant's irrational, erratic behavior during the entire incident, a decision was made to order an ambulance (1Tr. at 39). Detective Bailey has, during his law enforcement career, observed individuals act in a similar manner when under the influence of alcohol or drugs, or suffering from a mental disorder (1Tr. at 39, 42-43).

While they were waiting for the ambulance, Detective Bailey heard defendant say he was "over at his nigga's house smoking kush" and the detective heard "another spontaneous statement stating that the gray car over there was his and there was a gun under the seat." (1Tr. at 40). Detective Bailey did not hear anyone ask defendant about a gun (1Tr. at 40). The detective did not hear any officer make any statements or ask any questions (1Tr. at 40). No one asked defendant about weapons on his person or in his car or anywhere else (1Tr. at 40-41).

Because defendant was spitting at the officers and at the paramedics once they arrived, a hood was placed over defendant's head (1Tr. at 44).

Either Detective Bailey or his partner issued a citation for defendant's car being parked in an "emergency vehicle only" spot (1Tr. at 43). The car was searched during issuance of the citation (1Tr. at 43).

During the second hearing, Detective Bailey testified as follows: During the incident between defendant and law enforcement officers, Detective Bailey heard defendant make a spontaneous statement that "the gray car over there was his and that there was a gun under the seat." (2Tr. at 31). Detective Bailey did not hear any exchange between defendant and any officers about the car or gun (2Tr. at 57). When he said this, defendant looked over toward 12th Street which was directly in front of where this took place (2Tr. at 31). Detective Bailey observed a silver or gray car parked

9

on 12th Street facing east on the south curb in a lane that was exclusively marked with signs for emergency vehicles only (2Tr. at 31). Because this car was not an emergency vehicle, it was subject to being ticketed and towed (2Tr. at 32). Regardless of whether the vehicle belonged to defendant, it would have been ticketed and towed based on its location in an emergency-only spot (2Tr. at 32).

Kansas City Police policy states that an inventory search of the vehicle's property should be conducted prior to the vehicle being towed (2Tr. at 33). Every part of the vehicle's interior that could contain personal belongings is searched (2Tr. at 33). Any personal property or other items found during the search are documented on a tow-in report (2Tr. at 33). This is in case later someone claims items were in the vehicle when it was towed but were not, or if items present at the time of the tow are later found to be missing (2Tr. at 38).

During the inventory search of defendant's vehicle, a handgun was found underneath the driver's seat (2Tr. at 36, 37). One of the Kansas City police detectives found the handgun; Detective Bailey did not hear any FPS officer say a handgun had been found under the seat (2Tr. at 44).

The citation was left with the vehicle; it had been determined that the vehicle was registered to Tiara Gray and not to defendant (2Tr. at 41). Although the tow policy provides that officers should make every reasonable effort to contact the owner of the vehicle, the officers had no knowledge of Ms. Gray being present at the scene and no phone number is associated with a vehicle registration (2Tr. at 45).

10

Defendant was taken into custody before he was transported to the hospital in an ambulance (2Tr. at 54-55). He was not arrested by any Kansas City, Missouri, police officer on any charges relating to the incident (2Tr. at 56).

**Special Agent Travis Vas**

To become an FPS officer, one undergoes training on how to make arrests and what questions to ask when someone is taken into custody (2Tr. at 14). Special Agent Vas was trained to ask whether the person who is being detained has any weapons on his person (2Tr. at 14).

On March 10, 2016, Special Agent Vas went to the Federal Building (2Tr. 7). Defendant was already lying on the ground handcuffed when Special Agent Vas arrived (2Tr. at 7). He noticed that a uniformed officer's hand was bleeding, so he took the officer to the nurse's station in the Federal Building (2Tr. at 7). When Special Agent Vas returned to the front of the Federal Building, defendant was no longer present (2Tr. at 8). Special Agent Vas has no personal knowledge of the incident involving defendant and law enforcement officers (2Tr. at 8).

Special Agent Vas drafted the affidavit in support of the criminal complaint in this case (2Tr. at 6). Paragraph 5 of the affidavit reads:

> During a search incident to the arrest, Everett was asked if he had any weapons or contraband in his possession. Everett stated he had a weapon in his vehicle which was unlocked with the driver's door open on 12th Street.

(2Tr. at 6; D. Ex. 3).

Special Agent Vas also drafted a Report of Investigation (D. Ex. 1). Page 3 of that document includes the following:

11

FPS Officer Yadon asked Everett if he drove to FPS Officer Yadon's location and if Everett had any weapons on his person. Everett responded "Yes" and further stated, "I have a gun in the car."

(2Tr. at 7).

Special Agent Vas got his information from supplemental reports and speaking to law enforcement officers who were present during the incident (2Tr. at 8, 15). He is familiar with a supplemental report written by FPS Inspector Wright (D. Ex. 4) and a supplemental report written by Inspector Patterson (2Tr. at 10). The affidavit in support of the criminal complaint and the Report of Investigation drafted by Special Agent Vas are summary documents (2Tr. at 8).

Although Inspector Patterson's report states that Inspector Schwarz was one of the individuals who responded immediately to defendant, Inspector Schwarz did not prepare a report (2Tr. at 16). However, Special Agent Vas talked to Inspector Schwarz before drafting any documents (2Tr. at 16). He does not recall any of the specifics of his conversation with Inspector Schwarz other than taking him to get medical treatment from the nurse and generally asking, "What's going on?" (2Tr. at 18).

Although these two documents drafted by Special Agent Vas both indicate that defendant was asked if he had any weapons on him, no one told Special Agent Vas this (2Tr. at 9). When he heard that defendant had made the statement about having a gun in the car, "it was just such a spontaneous statement and the fact that we're always taught in training to ask if a person has weapons or contraband on their person, I had just assumed that that was asked of the defendant prior to him making that statement." (2Tr. at 9).

12

Q.   Let's go back to the examination about the criminal complaint, which was marked as Defendant's #3 and your affidavit there.  And counsel referred to Paragraph Number 5 in that affidavit which said that "Everett was asked if he had any weapons or contraband in his possession.  Everett stated he had a weapon in his vehicle which was unlocked with the driver's door open at 12th Street."  Where did you -- from whom did you get that information?

A.   Sir, honestly, when I wrote that I believe that that question had been asked since it was such a spontaneous statement to have been made.  And with the training that goes with, and all our law enforcement officers receive, they'll always ask before you go hands-on with searching anybody, I had just essentially assumed that that question had to have been asked for him to make that statement.

Q.   So, just to make it precise.  No one -- you can't recall today if anyone gave you that information, you just -- your testimony is that you assumed that given the fact that this is a standard procedure that that's what happened?

A.   Yes, sir.  I can't recall any specific -- where that was specifically said to me.  That's correct, Your Honor.

Q.   Okay.  All right.  So, do you -- I guess I'm trying to think if -- I'm trying to get it clear.  Do you just not remember today or at the time did you just kind of think, well, this is probably what happened? . . . [D]o you remember at the time you executed the affidavit, do you remember at that time where you got this information from?  Was it -- do you remember somebody told you that, but you can't remember who had told you that?  Do you think that, no, that's not what happened.  You just assumed that that's, you know, somebody may have said this to you or you just kind of made it up or what?

A.   I truly believe when I was talking to every -- all the different parties involved, Your Honor, that somehow something had to have been said where it clicked, that that question had to have been asked and maybe I was placing the next logical step in the sequence.

Q.   Okay.

A.   But at the time when I wrote it, I truly believed that's how the circumstance went down, sir.

Q.   . . . So, if I've got this right, and let me restate it, and if I'm wrong, correct me.  At the time you had -- it was a fluid situation.  You had talked to a

13

number of people. You believe that somebody told you that Everett was asked if he had any weapons and that he said that he had weapons. You reported what he's alleged to have said. Is that much true?

A.     Yes, sir.

Q.     Okay. And what would you have added here to that, do you think, that was just based on experience or protocol?

A.     Experience and protocol, yes, Your Honor. Just --

Q.     Yeah. But what part of it? Was that just supported by -- was that just kind of what you interpreted it to mean at the time?

A.     As far as asking that question -- when they went hands-on with the search, Your Honor? Yes. Based on my training and everything like that, -- that to me was just a logical step. And with him making that statement, Your Honor, I figured there had to have been some type of question asked for him to just go straight from keys to a car on the ground to gun in the car.

(2Tr. at 19-22).

In his viewing of a video of the incident, it appeared to Special Agent Vas that something resembling keys was tossed or flung from defendant's hands as he was coming down to the ground; however, Special Agent Vas has no knowledge of what happened to the keys (2Tr. at 9-10). He does not know why they are not listed as having been seized from the defendant other than that he does not think it was anything FPS collected as far as personal property (2Tr. at 25).

Special Agent Vas has no knowledge about when defendant was arrested (2Tr. at 26). Because FPS has no way to tow a vehicle from a city street, defendant's car would had to have been towed by the Kansas City Police Department (2Tr. at 26-27). Special Agent Vas has no direct knowledge about the search of the vehicle, the finding of the gun, or the inventory search (2Tr. at 28).

14

**Reports of Special Agent Vas**

In D. Ex. 1, Special Agent Vas wrote that, "The subject was arrested by FPS and the Kansas City Police Department (KCPD). During a search incident to arrest, EVERETT stated he had a firearm in his vehicle." (D. Ex. 1, p. 1). The report further states:

> The FPS Officers decided to arrest EVERETT for being in violation of Title 18, United States Code, Section 111(a)(1) -- whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties. The FPS Officers attempted to arrest EVERETT standing up by taking control of EVERETT's hands to place them behind EVERETT's back.

(D. Ex. 1, p. 3).

> While waiting for Emergency Medical Services, EVERETT was searched incident to the arrest. EVERETT had in his front right jeans pocket, a bag with a substance that field tested positive for heroin.

(D. Ex. 1, p. 3-4).

> EVERETT also had a Kansas State Driver's Licence. . ., a cellular phone, lighter, two dice, a pack of Newport cigarettes, and a tube of Carmex lip balm. FPS Officer Yadon asked EVERETT if he drove to FPS Officer Yadon's location and if EVERETT had any weapons on his person.[3] EVERETT responded, "Yes" and further stated, "I have a gun in the car." . . . During the search incident to the arrest of EVERETT's person, EVERETT was not notified of his Miranda Rights.

(D. Ex. 1, p. 3-4).

---

[3]In D. Ex. 3, the affidavit in support of the criminal complaint, Special Agent Vas states in paragraph 5 that "[d]uring a search incident to the arrest, EVERETT was asked if he had any weapons or contraband in his possession. EVERETT stated he had a weapon in his vehicle which was unlocked with the driver's door open on 12th Street."

15

**Inspector David Wright**

Inspector Wright assisted in the incident with defendant and prepared a report

afterward (D. Ex. 4).  He wrote:

> Before EMS arrived, the SUBJECT continued to make numerous verbal threats
> and was attempting to spit on the other FPS Officers and KCPD Officers.  I
> heard someone ask the SUBJECT a question and he replied "I have a gun in the
> car."  I do not know who went to [the] car, but FPS and KCPD started to conduct
> a search of the individual.  After rolling the SUBJECT to the side, it produced
> some type of credit card, Driver's license, keys, and a small baggie with an
> unknown substance.  I saw two very small black items.  A separate KCPD Officer
> picked it up and stated it was possibly heroin.

(D. Ex. 4., p. 2).

**Officer Wesley Patterson**

In a report generated by Officer Patterson, he noted that at approximately 8:30

a.m., he heard on a police radio that FPS inspectors had been requested due to an

unruly person in the lobby of the Federal Building.  "Inspector Wright, Inspector C.

Schwarz, Inspector D. Yadon and I responded immediately.  Area Commanders C.

Schwarz and Burnetta and District Commander M. Yadon arrived approximately one

minute later.  Threat Branch Manager Chief Reuschlein arrived shortly thereafter, as did

Special Agent Vas."  Officer Patterson then describes defendant's behavior, the attempt

to take him to the ground, the arrival of the police detectives, and the search of

defendant's car. (D. Ex. 5).

*III.   STATEMENT*

    *A.   MIRANDA*

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any

criminal case to be a witness against himself."  In <u>Miranda v. Arizona</u>, 384 U.S. 436,

16

460-461 (1966), the Supreme Court for the first time extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police. The Fifth Amendment itself does not prohibit all incriminating admissions; "[a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." United States v. Washington, 431 U.S. 181, 187 (1977). The Miranda Court, however, presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his Miranda rights and freely decides to forgo those rights. New York v. Quarles, 467 U.S. 649, 654 (1984). The prophylactic Miranda warnings therefore are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." Michigan v. Tucker, 417 U.S. 433, 444 (1974). Requiring Miranda warnings before custodial interrogation provides "practical reinforcement" for the Fifth Amendment right. New York v. Quarles, 467 U.S. at 654; Michigan v. Tucker, 417 U.S. at 444.

**Custody**

Miranda warnings are required only when a person's freedom has been so restricted as to render him "in custody." United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006). The ultimate inquiry is whether (1) the person has been formally arrested, or (2) the person's freedom of movement has been restrained to a degree associated with a formal arrest. Id. at 909. When a suspect is placed in handcuffs by

17

police, his freedom is restricted to a degree often associated with formal arrest; and for Miranda purposes, he is considered to be in custody. Id.

**Interrogation**

The term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. Id. at 301-302.

In United States v. Martinez, 462 F.3d 903 (8th Cir. 2006), a pedestrian matching the description of an armed bank robber was stopped and handcuffed. When the man was patted down for weapons, police recovered a wad of cash but no gun. Without advising him of his Miranda rights, police asked the man where he got the cash. The man said he just got paid from his place of employment, but officers expressed disbelief and the man changed his story, saying he saw a man running in the park and then found the cash nearby. This, the court found, amounted to interrogation.

> The government argues that so long as the encounter remained a Terry stop, no Miranda warnings were required. But the Supreme Court has indicated that the analysis is not that simple. In Berkemer v. McCarty, 468 U.S. 420 (1984), the Court looked to the circumstances involved in a traffic stop to conclude that the suspect's freedom of action was not "curtailed to a 'degree associated with formal arrest'" as to require Miranda warnings. In holding that the traffic stop at issue in Beheler was akin to a Terry stop, the Court held that, "by itself," the stop did not render him "in custody." Analyzing the factual circumstances, the Court noted that the "respondent has failed to demonstrate that, at any time between

18

the initial stop and the arrest, he was subjected to restraints comparable to those associated with a formal arrest." Thus, the Court looked not to the fact that the detention was a Terry stop, but rather to the circumstances bearing on the question of custody, just as we have done here. The Court noted that some traffic/Terry stops might involve such restraint, necessitating Miranda warnings. "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Citing Berkemer, this court has previously implied the possible need for Miranda warnings during a Terry stop. "[M]ost Terry stops do not trigger the detainee's Miranda rights." In this case, as we have said, Martinez was, under the circumstances, subjected to restraint associated with formal arrest, and was interrogated during that custody. Therefore, we follow the Supreme Court's cue and find that he was entitled to Miranda warnings at the time he was handcuffed. Since Miranda warnings were not given before Martinez gave conflicting accounts of how he got the wad of cash, those statements should have been suppressed.

United States v. Martinez, 462 F.3d at 909-910 (citations omitted).

In this case, the sole question with respect to the statement is whether defendant was asked by law enforcement whether he had any weapons, because clearly such a question would amount to interrogation.

It is the government's burden to prove by a preponderance of the evidence that defendant's statement was voluntary. United States v. Boslau, 632 F.3d 422, 429 (8th Cir. 2011). Requiring Miranda warnings before custodial interrogation provides "practical reinforcement" for the Fifth Amendment's right against compulsory self-incrimination. New York v. Quarles, 467 U.S. at 654; Michigan v. Tucker, 417 U.S. at 444. Based on the conflicting evidence before me, I cannot find that the government has met its burden here.

Special Agent Vas indicated in both the affidavit in support of the complaint and in his Report of Investigation that defendant was asked if he drove to the scene and if he had any weapons.

Detective Bailey heard defendant's statement, but he testified that he did not hear any officer make any statement or ask any question prior to defendant saying he had a gun in his car. However, this is not consistent with the testimony of other officers, including Inspector Yadon who testified that he in fact asked defendant if he had driven to the scene prior to defendant stating that he had a gun.

Inspector Wright's report states that he heard an officer ask defendant a question before defendant said he had a gun in the car.

Special Agent Vas testified that he got to the scene after defendant had been taken into custody and then accompanied an inspector to a nurse's office. However, Officer Patterson wrote in his report that Special Agent Vas arrived shortly after the unruly person was reported in the lobby; and according to Officer Patterson's report, Special Agent Vas arrived before the struggle with defendant took place. This conflicts with Special Agent Vas's testimony about how much personal information he had about the incident versus what he had to have been told by others.

The Report of Investigation prepared by Special Agent Vas is especially troubling when trying to ascertain what actually happened. This report (in which, according to his testimony, he merely assumes the question about weapons was asked) is full of very specific detail -- name, date of birth, phone number, address of registered owner of the car; the citation number and time the citation was issued; the officers who eventually went to the hospital and assisted medical personnel in restraining defendant there so a sedative could be administered; defendant's criminal history and Department of Motor Vehicles information; the description of the firearm including the serial number and the nexus check; the information about defendant's parole violation warrant from the

20

Kansas Department of Corrections; the dates of transport including the starting and ending mileage of the transport vehicles, etc.  This document continues to recount events through July 8, 2016 -- approximately three months after the incident.  I find it difficult to believe that a Special Agent would assume something as important as whether an officer asked a defendant who was in custody and had not been advised of his Miranda rights (both of which were included in his report) whether he had any weapons, but failed to seek clarification of that assumption during the three months that elapsed from the time of the incident to the conclusion of the report.

Additionally, Special Agent Vas's testimony that he assumed defendant was asked about weapons because that's what officers are trained to do does not logically mesh with the report's admission that no Miranda warnings were given, for officers are also trained that questioning a suspect who is in custody requires such warnings.  If Special Agent Vas was told that no Miranda warnings were given, contrary to training, it seems logical that he would clarify that no one asked about a weapon, even though they are told to ask such a question.  Further, it is remarkable to me that something as important as factors used to determine custodial interrogation would be assumed in a sworn affidavit in support of a criminal complaint.  Another possibility is that Special Agent Vas included in his report and affidavit precisely what he was told at the scene, i.e., that defendant was asked if he had any weapons.

I have struggled with the facts before me, attempting to figure out from all of the evidence what actually happened.  It is undisputed that defendant was handcuffed and restrained with multiple officers on top of him -- clearly he was in custody for Miranda purposes.  It is undisputed that he was not advised of his Miranda rights.  There are

21

multiple versions of what prompted defendant to state that he had a gun in the car -- he was asked nothing, he was asked whether he drove, he was asked if he had any weapons.  It is not often that I am faced with judging the credibility of witnesses with conflicting testimony when all of those witnesses are testifying for the same party; in fact, this is a first.

The defendant's constitutional right under the Fifth Amendment cannot be set aside because government witnesses remember events differently.  Not only is there no legal precedent for this approach, it may create encouragement for officers to nullify constitutional violations simply by presenting conflicting testimony when their actions are challenged in court, or by having an officer who has no personal information prepare the affidavit or report with a different version of what occurred.  The government bears the burden of establishing that statements are voluntary, that Miranda rights were given, that Miranda rights were knowingly and voluntarily waived, or that an exception to the Miranda requirement applies.  The government here bears the burden of establishing by a preponderance of the evidence that the dictates of Miranda were complied with and defendant's constitutional rights were therefore not violated.  This it has not done.

### B.    PUBLIC SAFETY EXCEPTION

The government argues that the public safety exception to Miranda applied in this case when defendant was asked, "Did you drive here?"

> Here, FPS Inspector Yadon made three observations at the scene which prompted the question.  First, prior to Defendant being detained, Insp. Yadon had observed Defendant walking from the direction of a vehicle that was parked in "Emergency Vehicle Only" parking along the street.  Second, with Defendant detained, Insp. Yadon saw a set of car keys sitting in front of Defendant on the

22

ground, which had been removed from Defendant's pocket.  Third, Insp. Yadon observed that the car that was parked in "Emergency Vehicle Only" parking would have to be moved as it was illegally parked and posed a hazard where it sat.  With those observations, Yadon asked Defendant the innocuous question: "Did you drive here?"  To that question, Defendant replied "Yes."  Defendant thereafter stated "I have a gun in the car."

(Doc. 38, p. 4).

Under the public safety exception, a suspect's answer may be admitted into evidence if it was obtained in response to a question asked in furtherance of public safety and not designed solely to elicit testimonial evidence, even if Miranda warnings had not yet been given.  New York v. Quarles, 467 U.S. at 655-656, 659 & n. 8.  The exception does not depend upon the questioning officers' subjective motivation.  Rather, it is judged under an objective standard and "applies when 'police officers ask questions reasonably prompted by a concern for the public safety.'"  United States v. Liddell, 517 F.3d 1007, 1009 (8th Cir. 2008) (quoting New York v. Quarles, 467 U.S. at 656).  The rationale in Quarles was the potential cost to society if Miranda warnings are required even when the public's safety is at risk:

The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket.  So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

In such a situation, if the police are required to recite the familiar Miranda warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding.  Procedural safeguards which deter a suspect from responding were deemed acceptable in Miranda in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the Miranda majority was willing to bear that cost.  Here, had Miranda warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost

23

would have been something more than merely the failure to obtain evidence useful in convicting Quarles.  Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

New York v. Quarles, 467 U.S. at 657.

In arguing that the public safety exception applies in this case, the government cites United States v. Liddell and United States v. Everman.  In United States v. Liddell, 517 F.3d 1007, 1009-1010 (8th Cir. 2008), Liddell was arrested, and while his car was being searched police found a gun.  They asked Liddell if there was anything else in the car that they needed to know about that could hurt them, which prompted Liddell to make an incriminating statement.  The Court of Appeals held that the police question fell within the public safety exception:

> Our prior cases recognized that the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment *that the police are about to search.*

Id. at 1009-1010 (emphasis added).

In United States v. Everman, 528 F.3d 570 (8th Cir. 2008), officers saw a pickup truck in a remote and isolated area with license plates more than a year expired.  Everman approached them, and shortly thereafter another man approached from a nearby trail.  Both men had known criminal records and one (Everman) had an outstanding warrant.  Everman was arrested on the warrant and before the officer began to search his person incident to arrest, he asked Everman if he had any weapons.  Everman replied that he had a pistol in the pickup.  The court of appeals held that under these circumstances the public safety exception applied.  As was the

24

case in <u>Liddell</u>, the officers were about to conduct a search incident to Everman's arrest.

Those cases are distinguishable from the one before me now. First, the government's argument that the question, "Did you drive here?" is in furtherance of the public safety is not persuasive. The balancing test in <u>Quarles</u> was whether to give <u>Miranda</u> warnings and risk leaving a gun in a public supermarket, or forego <u>Miranda</u> warnings to find out where Quarles threw the gun and remove it from a public place. The balancing test in <u>Everman</u> and <u>Liddell</u> was the safety of the police officers who were about to conduct searches incident to arrest. The balancing test here, according to the government, is to leave an unruly man's car illegally parked, when they have the immediate remedy of towing the car from its illegal spot. Indeed that remedy existed regardless of whether defendant had driven that car to the Federal Building, so any answer by defendant to the question, "Did you drive here?" would provide the police with no information that would protect the public and would result exclusively in the defendant admitting to being in constructive possession of anything found in that car. That is a clear violation of <u>Miranda</u>.

The government alternatively argues that the question, "Do you have any weapons?" falls within the public safety exception. The problem is that the government has presented nothing but conflicting evidence on the issue of whether that question was ever asked. Furthermore, the government denies in its response that this question was ever asked. Again, it is the government's burden to establish by a preponderance of the evidence that defendant's constitutional rights were not violated in obtaining his statement. The evidence before me now does not establish by a preponderance of the

evidence that the question was or was not asked. It simply establishes that many versions of the incident have been reported, and at least one of those versions is that defendant was asked whether he had any weapons (and indeed that version is the one the government urges the court not to credit).

### C. CONCLUSION

Because the government has failed to satisfy its burden of establishing by a preponderance of the evidence that defendant's statement (1) was not the result of custodial interrogation, and (2) was the result of a question by police that falls within the public safety exception to <u>Miranda</u>, defendant's statement should be suppressed.

## IV. FIREARM

### A. INVENTORY SEARCH

Defendant argues that the search of the car was impermissible because defendant's statement that he had a gun in the car was the result of not merely a <u>Miranda</u> violation but coercive police action and as such derivative evidence (the gun found in the car) is subject to suppression. The government argues that the gun was discovered during a lawful inventory search of the vehicle.

In <u>South Dakota v. Opperman</u>, 428 U.S. 364, 368-369 (1976), the Supreme Court noted two common police practices. First, "automobiles are frequently taken into police custody" in the interests of public safety and "community caretaking functions." Second, "[w]hen vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents." The Court concluded that, properly implemented, these practices do not run afoul of the Fourth

Case 4:16-cr-00110-BCW    Document 62    Filed 03/03/17    Page 26 of 32

Amendment's search warrant requirement.  Id. at 376.  This Fourth Amendment ruling

has come to be known as the "lawful inventory search" exception to the warrant

requirement because evidence of criminal activity is sometimes discovered during an

inventory search.

In Colorado v. Bertine, 479 U.S. 367, 375 (1987), the Supreme Court addressed

the question whether an inventory search was unconstitutional because the police

department regulations gave officers discretion to choose between towing a vehicle and

leaving it parked where it was.  The Court concluded that the Fourth Amendment

permits exercise of such discretion, so long as that discretion is exercised according to

standard criteria and on the basis of something other than suspicion of evidence of

criminal activity.  Testimony can be sufficient to establish police towing procedures so

long as the officer's judgment is exercised based on legitimate concerns related to the

purposes of towing.  United States v. Arrocha, 713 F.3d 1159, 1163 (8th Cir. 2013).

Here the government offered the Kansas City, Missouri, Police Department's tow

policy which establishes that police may tow a vehicle that is illegally parked.  "When a

vehicle is observed to be abandoned or is illegally parked and is causing a

problem/hazard officers will tow the vehicle.  Officers will make every reasonable effort

to contact the owner."  (P. Ex. 6, p. 9).  In this case, the undisputed evidence is that a

car was parked in an emergency-vehicle-only parking spot in front of the Federal

Building, it was not an emergency vehicle, and the registration information showed that

a female owned the car and that female was not in the vicinity.  Police were well within

their authority to tow the car and were also, therefore, entitled to conduct an inventory

search.

### B.    DERIVATIVE EVIDENCE

Defendant argues that because his statement was coerced, the search of the car was not lawful because the gun found during that search is evidence derivative of the involuntary statement.

The Supreme Court, in <u>United States v. Patane</u>, 542 U.S. 630 (2004), held that a statement obtained in violation of <u>Miranda</u> does not automatically require suppression of any evidence gathered because of the statement.

> [B]ecause these prophylactic rules (including the the <u>Miranda</u> rule) necessarily sweep beyond the actual protections of the Self-Incrimination Clause, any further extension of these rules must be justified by its necessity for the protection of the actual right against compelled self-incrimination. Indeed, at times the Court has declined to extend <u>Miranda</u> even where it has perceived a need to protect the privilege against self-incrimination. See, e.g., <u>Quarles</u>, supra, (concluding "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination").

> It is for these reasons that statements taken without <u>Miranda</u> warnings (though not actually compelled) can be used to impeach a defendant's testimony at trial, though the fruits of actually compelled testimony cannot.  More generally, the <u>Miranda</u> rule "does not require that the statements [taken without complying with the rule] and their fruits be discarded as inherently tainted".  Such a blanket suppression rule could not be justified by reference to the "Fifth Amendment goal of assuring trustworthy evidence" or by any deterrence rationale, and would therefore fail our close-fit requirement.

> Furthermore, the Self-Incrimination Clause contains its own exclusionary rule.  It provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  Unlike the Fourth Amendment's bar on unreasonable searches, the Self-Incrimination Clause is self-executing.  We have repeatedly explained "that those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial."  This explicit textual protection supports a strong presumption against expanding the <u>Miranda</u> rule any further. . . .

> It follows that police do not violate a suspect's constitutional rights (or the <u>Miranda</u> rule) by negligent or even deliberate failures to provide the suspect with

the full panoply of warnings prescribed by <u>Miranda</u>. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. And, at that point, "[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy" for any perceived <u>Miranda</u> violation.

Because police cannot violate the self-incrimination clause by taking unwarned but voluntary statements, an exclusionary rule "cannot be justified by reference to a deterrence effect on law enforcement." <u>Id</u>. at 643. The word "witness" in the constitutional text limits the scope of the self-incrimination clause to testimonial evidence. <u>Id</u>.

There is no evidence before me that defendant's statement was coerced. The evidence is that his statement was obtained in violation of <u>Miranda</u> which, as discussed above, does not ipso facto result in suppression of the items about which the defendant spoke in his statement.

Because the firearm was seized during a lawful inventory search of the car, defendant's motion to suppress on this basis should be denied.

## V.    *HEROIN*

Finally, defendant argues that the heroin seized from his person should be suppressed on the ground that the search exceeded the bounds of a frisk for weapons. I agree.

The evidence establishes that defendant was not arrested. Being detained for purposes of <u>Miranda</u> is not necessarily the same as being arrested. <u>United States v. Martinez</u>, 462 F.3d 903 (8th Cir. 2006). Inspector Yadon testified that defendant was never placed under arrest for a crime; and in fact, once the gun was found in the car, Inspector Yadon was sent to the hospital to stay with defendant while an arrest warrant

was being sought.  Detective Bailey testified that defendant was not arrested.  Although his reports state that defendant was searched incident to arrest, Special Agent Vas testified that he actually had no knowledge about when defendant was arrested.

Because defendant was not arrested while he was in front of the Federal Building, the search of his person was not incident to arrest.

However, officers may conduct a pat down search to determine whether a person is carrying a weapon if the person is stopped due to a reasonable suspicion that criminal activity may be afoot and the officer is justified in believing that the person may be armed and dangerous to the officer or others.  Terry v. Ohio, 392 U.S. 1 (1968). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."  Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (citing Adams v. Williams, 407 U.S. 143, 146 (1972)).

In Minnesota v. Dickerson, 508 U.S. 366 (1993), the Court was faced with the question whether police officers may seize nonthreatening contraband detected during a protective pat down search of the sort permitted by Terry.  The courts employ the plain view doctrine in determining whether evidence observed during a pat down search can lawfully be seized.  Id.  Under that doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.  Horton v. California, 496 U.S. 128, 136-137 (1990).  However, if police do not have probable cause to believe that an object in plain view is contraband without conducting some further search of the object, i.e., if its incriminating character is not

immediately apparent, then the plain view doctrine cannot justify its seizure. <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987).

In this case, Inspector Yadon testified that defendant was searched and heroin was recovered from his person. Inspector Wright wrote in his report that officers searched defendant's person and seized a credit card, a driver's license, keys, and a small baggie with an unknown substance which was subsequently field tested and found to be heroin. Special Agent Vas wrote in his reports that defendant was searched and police seized a driver's licence, a cellular phone, a lighter, two die, a pack of Newport cigarettes, and a tube of Carmex lip balm.

There was no evidence offered by anyone that any law enforcement officer believed that any of these items were weapons or that the incriminating character of any of these items was immediately apparent without further investigation. The uncontradicted evidence was that defendant's person was searched "incident to arrest," even though no arrest took place.

Because the search of defendant's person was unlawful, the heroin seized from his pants pocket should be suppressed.

## VI.   CONCLUSION

Based on all of the above, I find that (1) the government has not satisfied its burden of proving by a preponderance of the evidence that defendant's statement was not obtained in violation of <u>Miranda</u>, (2) defendant's statement was not coerced and therefore the <u>Miranda</u> violation does not require suppression of the firearm, (3) the seizure of the firearm from the car was done pursuant to a lawful inventory search, and

(4) the seizure of the heroin was unlawful as the search of defendant's person exceeded to scope of a pat down for weapons.  Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order granting defendant's motion to suppress his statement (from the government's case in chief; however, the statement would be available as impeachment, United States v. Patane, 542 U.S. 630 (2004)), granting defendant's motion to suppress the heroin, and denying defendant's motion to suppress the firearm.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), specific objections must be filed and served within 14 days.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 3, 2017